IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Calvin Henry Fair, | ) | Civil Action No. 8:15-cv-04471-DCN-JDA |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to Local Civil Rule 73.02(B)(2)(a), D.S.C., and 28 U.S.C. § 636(b)(1)(B).[1]  Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claim for social security insurance benefits ("SSI").[2]  For the reasons set forth below, it is recommended that the decision of the Commissioner be affirmed.

**PROCEDURAL HISTORY**

On November 14, 2012, Plaintiff filed an application for SSI, alleging disability beginning December 31, 2005.  [R.162–67.][3]  The claim was denied initially and on

---

[1]A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

[2]Section 1383(c)(3) provides, "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. § 1383(c)(3).

[3]Plaintiff also filed applications for Disability Insurance Benefits on March 27, 2009, and on December 19, 2012 [R. 177–82, 155–61], but those benefits were denied. [R. 91–98.]

reconsideration by the Social Security Administration ("the Administration"). [R. 46–79.] Plaintiff requested a hearing before an administrative law judge ("ALJ") and on April 22, 2014, ALJ Marcus Christ conducted a de novo hearing on Plaintiff's claim.  [R. 21–45.]

The ALJ issued a decision on May 19, 2014, finding Plaintiff not disabled.  [R. 10–20.]  At Step 1,[4] the ALJ found Plaintiff had not engaged in substantial gainful activity since November 14, 2012, the application date.  [R. 12, Finding 1.]  At Step 2, the ALJ found Plaintiff had the following severe impairments: degenerative disc disease, intellectual deficits, a post-traumatic stress disorder and major depression.  [R. 12, Finding 2.]  The ALJ also found Plaintiff had problems with headaches and left-side numbness that did not represent severe impairments at any time relevant to the decision.  [*Id*.] The ALJ also noted Plaintiff had decreased grip strength in his left hand, but no joint abnormalities. [*Id*.] At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1.  [R. 12, Finding 3.]  The ALJ specifically considered Listings 1.04, 12.02, 12.04, 12.05, and 12.06.  [R. 12–14.]

Before addressing Step 4, Plaintiff's ability to perform his past relevant work, the ALJ found Plaintiff retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work (described as requiring lifting and carrying 20 pounds occasionally and 10 pounds frequently as well as an ability to stand, sit, and walk each for 6 hours in an 8-hour workday)

---

[4]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

with occasional climbing of ladders, ropes and scaffolds; frequent climbing ladders and ramps, crouching, stooping; occasional kneeling and crawling; frequent (as opposed to constant) overhead reaching; and no exposure to unprotected heights. The claimant is also limited to simple, routine tasks in a low stress work environment (described as involving only occasional changes in work setting and not involving production rate or fast-paced work) with only occasional interaction with the public and co-workers.

[R. 14, Finding 4.]  At Step 4, the ALJ noted Plaintiff was unable to perform his past relevant work as a laborer.  [R. 18, Finding 5]; but based on his age, education, RFC, and the testimony of a vocational expert, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform [R. 19, Finding 9].  On this basis, the ALJ found Plaintiff had not been under a disability as defined by the Act since November 14, 2012, the date the application was filed.  [R. 19, Finding 10.]

Plaintiff requested Appeals Council review of the ALJ's decision, but the Council declined.  [R. 1–6.]  Plaintiff filed this action for judicial review on November 4, 2015.  [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence because the ALJ failed to conduct a full and fair inquiry as to whether Plaintiff's impairments met or were equal to Listing 12.05C, and failed to consider all of Plaintiff's impairments and their combined effect on Plaintiff's ability to sustain gainful employment. [*See* Doc. 14.] Plaintiff asks this Court to reverse the ALJ's decision and either award benefits or remand the matter for further consideration. [*Id.* at 10.]

The Commissioner, on the other hand, contends the ALJ's decision is supported by substantial evidence and that he properly found that Plaintiff's impairments did not meet

or equal Listing 12.05C and adequately considered Plaintiff's impairments in combination. [*See* Doc. 15.] The Commissioner asks this Court to affirm the decision of the ALJ denying Plaintiff's claim for SSI. [*Id.* at 21.]

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result

4

as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994). Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)). Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision). To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence

or that the Commissioner incorrectly applied the law relevant to the disability claim.  *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled).  Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985);*see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand.").  After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction.  *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material

> and that there is good cause for the failure to incorporate such
> evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[5] With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98. The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. *See*

---

[5]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence. *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992). Further, the Supreme Court of the United States has not suggested *Borders'* construction of § 405(g) is incorrect. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990). Accordingly, the Court will apply the more stringent *Borders* inquiry.

*Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an

order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C.

§ 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured

for benefits, who are not of retirement age, who properly apply, and who are under a

disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by
> reason of any medically determinable physical or mental
> impairment which can be expected to result in death or which
> has lasted or can be expected to last for a continuous period
> of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations

have reduced the statutory definition of disability to a series of five sequential questions.

*See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency"

in considering disability claims).   The ALJ must consider whether (1) the claimant is

engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the

impairment meets or equals an impairment included in the Administration's Official Listings

of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents

the claimant from performing past relevant work; and (5) the impairment prevents the

claimant from having substantial gainful employment.  20 C.F.R. § 416.920.  Through the

fourth step, the burden of production and proof is on the claimant.  *Grant v. Schweiker*, 699

8

F.2d 189, 191 (4th Cir. 1983).  The claimant must prove disability on or before the last day of her insured status to receive disability benefits.  *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969).  If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience.  *Grant*, 699 F.2d at 191.  If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary.  20 C.F.R. § 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.     *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* § 416.972(b).  If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* § 416.974–.975.

### B.     *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* § 416.921.  When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments.  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).  The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir.

9

1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

## C.  *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. § 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[6]  20 C.F.R. § 416.920(a)(4)(iii), (d).

## D.  *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the

---

[6]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

claimant's residual functional capacity[7] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. § 416.960(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See* 20 C.F.R. § 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).   To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").   Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[8]   20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).   When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to

---

[7]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).

[8]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs.  20 C.F.R. § 416.969a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.* Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  § 416.969a(c)(1).

perform other work.  20 C.F.R. § 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. § 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. § 416.927(c).  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 416.927(c)(2).  An ALJ determination coming

13

down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. § 416.927(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. § 416.917. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling

pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 416.928. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v.*

*Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner thereafter issued the

following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.  If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability.  Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered.  Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990).  SSR 90-1p has since been

superseded by SSR 96-7p, which is consistent with SSR 90-1p.  *See* SSR 96-7p, 61 Fed.

Reg. 34,483-01 (July 2, 1996).  SSR 96-7p provides, "If an individual's statements about

pain or other symptoms are not substantiated by the objective medical evidence, the

adjudicator must consider all of the evidence in the case record, including any statements

by the individual and other persons concerning the individual's symptoms."  *Id.* at 34,485;

*see also* 20 C.F.R. § 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

16

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985).  Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

**Relevant Medical History**

On May 29, 2008, and June 9, 2008, Plaintiff presented to L. Randolph Waid, Ph.D. (Dr. Waid), a licensed clinical psychologist and clinical associate professor in Psychiatry and Neurology a the Medical University of South Carolina ("MUSC"), on referral from his attorney Alan Toporek, for a psychological evaluation in relation to an ongoing lawsuit.  [R. 253–58.]  Dr. Waid was asked to evaluate Plaintiff with regard to any disruptive emotional/behavioral difficulties he may be experiencing as a result of his involvement in an incident with the Hanahan Police on March 12, 2008.  [R. 253.]

According to Plaintiff's summary of the incident involving the police, he was returning home from working as a carpenter and painter when he got off of the bus; he then walked

17

toward home with another individual who was confronted and detained by police. [*Id.*] Plaintiff was asked to lay on the ground with his arms out to his side, and he complied. [*Id.*] Subsequently, another officer approached and was informed that Plaintiff did not need to be handcuffed. [*Id.*] The officer, however, not only handcuffed Plaintiff, but slammed him into the hood of the car and choked him with repetitive punches. [R. 254.] The officer that assaulted Plaintiff was sent away, and Plaintiff was advised that he could file an assault charge, which he did. [*Id.*] Following the incident, Plaintiff reported experiencing mid- and low back pain, as well as pain affecting the left arm. [*Id.*] Plaintiff also continued to undergo dental intervention including placement of a bridge and root canals as a result of the incident. [*Id.*] Plaintiff also received treatment at Trident Pain center due to a diagnosis of cervical and thoracic sprains/strains and muscle spasms. [*Id.*]

At the time of the evaluation by Dr. Waid, Plaintiff was still under the care of Dr. James B. Wisner ("Dr. Wisner") and was expecting the undergo double bridge abutment, as well as root canal and placement of a crown. [*Id.*] Plaintiff reported that he continued to experience some discomfort and pain affecting the back as well as numbness affecting the left hand and discomfort affecting the left shoulder. [*Id.*] He also reported being depressed all of the time and having a new fear of police officers. [*Id.*] Plaintiff reported being socially withdrawn and consuming an increased amount of alcohol for self-medication. [*Id.*]

With respect to motor functioning, Plaintiff complained of mild residual weakness and discomfort affecting left shoulder; back pain aggravated by lifting, physical exertion and bending; left shoulder pain aggravated by lifting above the shoulder region; occasional

headaches; and occasional bouts of dizziness that appeared to be orthostatic in nature. [*Id.*] With regard to cognitive functioning, Plaintiff had no complaint of attention/concentration difficulties or memory problems. [*Id.*] With regard to psychological functioning, Plaintiff reported experiencing problems with depression as well as difficulty falling asleep and nightmares. [*Id.*] Plaintiff reported some difficulties with irritability and anger which he described as a "new problem." [*Id.*] He reported increased fearfulness as well as tending to isolate himself within the home setting; loss of weight due to reduced appetite; and decreased libido. [*Id.*]

Plaintiff reported receiving a high school diploma, being identified as a special needs student with placement in resource classrooms, and receiving speech therapy. [R. 255.] Dr. Waid administered a number of tests to Plaintiff. The Personality Assessment Inventory (PAI) was administered to understand his psychological/emotional functioning. [*Id.*] Plaintiff's responses to the PAI were described by Dr. Waid as "somewhat unusual" in that Plaintiff's responses indicated a defensiveness about particular personal shortcomings as well as an exaggeration of certain problems. [*Id.*] Plaintiff described problems of greater intensity than is typical of defensive respondents in the areas of impact of traumatic events; physical signs of anxiety; rumination and worry; unhappiness; tension and apprehension; unusual sensory-motor problems; poor interpersonal rapport; physical signs of depression; disruption in thought process; suspiciousness; frequent routine physical complaints; irrational fears; hostility and bitterness; feelings of helplessness; preoccupation with physical functions; distrust; failures in relationships; moodiness; as well as a history of antisocial behavior. [R. 256.] The PAI clinical profile revealed Plaintiff

reported experiencing significant thinking and concentration problems accompanied by prominent agitation and distress; reported being withdrawn and isolated with few close interpersonal relationships; and reported getting anxious and threatened by interpersonal relationships.  [*Id.*]

Plaintiff reported experiencing significant suspiciousness and hostility in his relations with others, possibly a recent onset related to his report of increased fear and vigilance with regard to police officers.  [*Id.*] In his interview, phobic behaviors were present.  [*Id.*] Overall, Dr. Waid determine Plaintiff's PAI clinical profile to be suggestive of an Axis I diagnosis of posttraumatic stress disorder ("PTSD").  [*Id.*]  In response to the Detailed Assessment of Postraumatic Stress ("DAPS") test, Dr. Waid determined that Plaintiff consciously attempted to avoid people, places, conversations and situations that might trigger flashbacks or other intrusive re-experiencing symptoms; as well as avoid certain thoughts and feelings.  [R. 256–57.]  According to Dr. Waid, hyperarousal symptoms involve reports of tension, sleep difficulty, irritability, problems with attention and concentration, hypervigilance, and heightened startle response, and often leads to the use of alcohol or other sedating devices to downgrade the emotional state the person is experiencing. [R. 257.]  Dr. Waid noted that Plaintiff's response to DAPS suggested he does experience disruptive symptoms associated with PTSD.  [*Id.*]

While Plaintiff's symptoms were consistent with a diagnosis of PTSD, Dr. Waid felt that his difficulties were amenable to intervention and noted that Plaintiff had not been provided any psychological intervention.  [*Id.*]  Dr. Waid noted that while the evaluation revealed Plaintiff was experiencing disruptive re-experiencing, avoidant and hyperarousal symptoms associated with PTSD, Dr. Waid did not believe this experience should result

20

in a chronic impairment.  [R. 258.]   Dr. Waid recommended investment in psychological counseling emphasizing exposure/desensitization techniques with respect to Plaintiff's ongoing fears; as well as the use of an antidepressant to assist with disruptive symptoms.  [*Id.*]   Dr. Waid opined that the combination of psychological counseling with pharmacotherapy should render the prognosis for a favorable recovery to be good; however, Dr. Waid noted that Plaintiff did not have funding to pursue treatment at this time.  [*Id.*]

On May 7, 2009, Plaintiff underwent a confidential psychological evaluation at Palmetto Health Psychology, LLC, which was conducted by Sherry Rieder, Ph.D. (Dr. Rieder), clinical psychologist.  [R. 259–62.]  Plaintiff's mood was described as "bad" and he endorsed feelings of hopelessness, worthlessness and anhedonia.  [R. 259.] Plaintiff reported being beaten up by the police in March 2008, his mother suing the police, waking up at night with vague nightmares, and a vague description of his symptoms. [*Id.*] Plaintiff denied symptoms consistent with persistent avoidance or persistent hyperarousal related to the police incident.  [*Id.*]   Dr. Rieder reported that Plaintiff had not received any psychotherapy or counseling, no psychiatric hospitalizations, and his medications were prescribed by the Harvest Free Clinic and included Zoloft, Trazadone and Ibuprofen.  [*Id.*]

Plaintiff reported being able to perform all personal hygiene tasks on his own; never attempting to obtain a driver's license; and relying on his mother to perform all housekeeping tasks,  to take him places, and to manage his money, household shopping and bills.  [R. 260.]  Plaintiff reported having a 16 year old daughter with whom he has no contact; denied using alcohol, tobacco or recreational drugs; and was extremely vague in

describing his legal history.  [*Id.*]  Plaintiff reported dropping out of school in the 10th grade because he had problems with math; he also admitted to some history of special education, but denied being in a self-contained classroom environment.  [*Id.*]

Dr. Rieder tested Plaintiff to assess his cognitive ability but noted that Plaintiff's effort was sub-optimal and that the results underestimated his abilities and were inconsistent with his presentation (vocabulary and comprehension in conversation). [*Id.*] Dr. Rieder also noted that his results represented a significant decline from his 1986 Charleston County School evaluation and that such a marked decline is highly unusual, particularly a decline in all categories including crystallized knowledge.  [*Id.*] Plaintiff's test results assessed him with a verbal IQ score of 61, a performance IQ score of 59 and a Full Scale IQ score of 56, all in the extremely low range.  [*Id.*]  Plaintiff's academic achievements were also lower than would be expected based on his assessed intellectual capacity.  [R. 261.]  For instance, Plaintiff's reading and math equivalency was at the 2nd grade level; and his spelling equivalency was at the 1st grade level.  [*Id.*] Dr. Rieder stated she strongly suspected Plaintiff of malingering during her testing today; she diagnosed Plaintiff with major depressive episode on Axis I; rule-out borderline intellectual functioning and rule-out antisocial personality disorder on Axis II; vague muscle aches on Axis III; and a GAF score of 68 on Axis V.  [*Id.*]  Dr. Rieder noted that Plaintiff had recently begun to take antidepressant medications, but had not been on them long enough to be fully effective. [R. 262.] Dr. Rieder opined that Plaintiff likely had the mental capacity for at least simple and routine work, such as the welding job he had done in the past.  [*Id.*]  She opined also that Plaintiff's ability to work will likely be improved if he continues with

consistent treatment for his symptoms of depression including regular medication and that he will likely benefit significantly from psychotherapy or counseling to help him improve his coping skills. [*Id.*] Dr. Rieder noted that Plaintiff has no experience managing money in his lifetime and, thus, he would benefit from some supervision of any income he receives. [*Id.*]

On July 23, 2009, Plaintiff underwent x-rays of his cervical spine and was diagnosed with mild degenerative disc disease of the cervical spine, mild straightening of the normal cervical lordosis may be related to positioning, and possible muscular spasm could not be excluded. [R. 265.] X-rays of the lumbar spine showed mild levoconvex scoliosis; mild facet arthropathy of the lumbar spine most pronounced at L4-5 and L5-S1; and mild degenerative changes of the sacroiliac joints and of both hips. [R. 266.] X-rays of Plaintiff's left shoulder showed small osteophyte at the distal acromion and no acute fracture line. [R. 267.]

Also on July 23, 2009, Plaintiff underwent a comprehensive evaluation by Dr. Douglas E. McGill, M.D. ("Dr. McGill") on behalf of vocational rehabilitation for purposes of determining disability. [R. 268.] Plaintiff reported being disabled due to mental illness in addition to bad back pain. [*Id.*] Plaintiff reported being in an altercation with the police and being handcuffed and thrown to the ground; he also reported having back pain since he was a child which prevented him from playing sports and doing things like other kids. [*Id.*] Plaintiff reported being treated with shots and medications and being told he needed to see a specialist who wanted to operate, but Plaintiff chose not to. [*Id.*] Plaintiff reported his back pain being worse with lifting or staying in one position for too long. [*Id.*] He

reported throbbing and numbness after sitting for 5 minutes; pain radiating from the low back up and out to the 3rd and 4th fingers of his left hand; and difficulty gripping with his left hand when the low back pain is bad.  [*Id.*]

Dr. McGill noted that a review of records from 2008 indicated treatment for cervical and thoracic sprains treated conservatively and left shoulder pain which resolved.  [*Id.*] Dr. McGill noted Plaintiff has been on medication for his mental disorder for about a year and has good and bad days mainly related to pain.  [*Id.*]  On physical exam, Plaintiff's upper extremity strength was intact against resistance with all major muscle groups; fine motor movements were intact; lower extremity strength was intact against resistance in all major muscle groups; low back pain and radiating pain to the left hand was reproduced with tapping on the left shoulder and left heel with Plaintiff in a seated position; can sit without frequent shifting position; gait was normal; Plaintiff could get on and off exam table, don and doff his shoes and socks leaning to the floor; and balance was intact, static and dynamic in Rhomberg position.  [R. 269.]  Dr. McGill assessed Plaintiff with complaints of low back pain with non-physiological description of symptoms and pain patterns, and without focal neuromuscular abnormalities that may interfere with function such as atrophy, abnormal muscle tone, or signs of nerve root tension.  [*Id.*]

On February 27, 2013, Plaintiff underwent a Confidential Psychological Evaluation by Gene J. Sausser, Ph.D., licensed clinical psychologist ("Dr. Sausser), on referral for a mental status evaluation in conjunction with his social security disability application.  [R. 287.]  Dr. Sausser noted that Plaintiff described experiencing problems with sleep, not wanting to be bothered by anything, and losing weight and feeling sluggish.  [*Id.*]  Plaintiff

24

also complained that the "meds" made him feel bad, sleepy and tired. [*Id.*]  Plaintiff reported that he attended school through the 12th grade but did not graduate; and he was in special education classes.  [*Id.*]  When employed, Plaintiff reported working as a painter's helper, a welder's helper, and in maintenance.  [*Id.*]  Plaintiff reported that he last worked as a welder's helper in 2008 and a doctor told Plaintiff to stop because he had a bend in his spinal cord.  [*Id.*]  Plaintiff reported that, at that time, he developed numbness and pain on the left side and it was still present.  [*Id.*]  Plaintiff reported few activities of daily living other than being in his room and laying down most of the day.  [*Id.*] Plaintiff reported difficulty dressing himself and tying his shoes because of his inability to bend; and that his mother helps him bathe because he cannot wash his right side. [R. 288.]  Plaintiff reported that he did not have friends and that he did not want to mess with people.  [*Id.*]  Plaintiff reported having a 22 year old daughter, being arrested once for domestic violence in 2010, and spending 8 months in jail for the domestic violence charge.  [*Id.*]

On mental status exam, Dr. Sausser noted that Plaintiff exhibited no problems with gait although he did favor his right side and limped somewhat.  [*Id.*]  Interpersonally, he showed anxiety at the beginning of the session but this cleared as the interview progressed.  [*Id.*] Plaintiff appeared cooperative and to answer questions honestly.  [*Id.*] Dr. Sausser noted no problems with Plaintiff's speech patterns, expressive or receptive language functions; and found him to be anxious and depressed with flat affect and oriented to person and place, but not as to time.  [*Id.*]  Dr. Sausser estimated Plaintiff's intellectual abilities to be in the mentally retarded range based on his response to several questions from the Wechsler Adult Intelligence Scale-IV ("WAIS-IV").  [*Id.*]  Dr. Sausser

noted that Plaintiff worked on an elementary level on both the Similarities and Comprehension questions from the WAIS-IV; and that his thought processing operated on somewhat an elementary level although there was no problem with thought content. [R. 289.] Dr. Sausser noted that Plaintiff complained of attention and concentration difficulty, but that this was difficult to assess other than with serial 7's which he performed very slowly. [*Id.*] Plaintiff also complained of memory difficulty, but that this was probably directly related to intellectual function. [*Id.*]

When asked about PTSD, Plaintiff did not understand the concept. [*Id.*] When Dr. Sausser explained that it had to do with stressful life events, Plaintiff reported that he was assaulted as a kid by his father and that he beat him up every day for as long as he could remember until he was 16 when the father went to prison. [*Id.*] He was also attacked with a knife by someone at age 17 for no apparent reason. [*Id.*] Plaintiff reported that his father beat his mother and other kids. [*Id.*] Plaintiff reported feeling depressed all day all the time and that he felt that somebody was going to hurt him. [*Id.*] Plaintiff stated that he just did not trust people. [*Id.*]

Dr. Sausser reported that Plaintiff was capable of performing simple, repetitive tasks, but would be anticipated to have some difficulties with persistence and pace due to general lethargy as well as his physical issues. [R. 290.] He assessed Plaintiff with posttraumatic stress disorder; physical abuse as a child; major depression, single episode, moderate; and social phobia. [*Id.*] Dr. Sausser also indicated he suspected mental retardation but did not diagnose it; he also noted left side numbness and pain by patient report; and assessed a GAF of 55 both currently and for the past 12 months. [*Id.*] Dr.

Sausser noted that, in the event Plaintiff was awarded funds, he is not able to manage funds on his own. [*Id.*]

Also on February 27, 2013, Plaintiff was seen by Dr. Thaddeus J. Bell, M.D. ("Dr. Bell") with regard to his left side numbness in light of his social security disability application. [R. 291.] Plaintiff reported that his main issues included mental health disorders including depression and PTSD due to being a victim of child abuse, as well as bipolar disorder which was diagnosed in 2000. [*Id.*] Plaintiff reported having poor memory and decreased energy; poor interpersonal skills and mood instability; and difficulty coping with authority and coworkers. [*Id.*] With respect to his back pain, Plaintiff reported pain at a 9/10 and difficulty with gripping and experiencing numbness with his left hand. [*Id.*] Dr. Bell reviewed Plaintiff's medical report and imaging studies including an x-ray of the lumbar spine showing scoliosis of the lumbar spine, facet arthropathy of L4-L5 and L5-S1, as well as mild degenerative changes of the sacroiliac joints of both hips. [*Id.*] Plaintiff also provided Dr. Bell with records from his previous disability examination from July 2009. [*Id.*]

Plaintiff reported to Dr. Bell that he does not like to be bothered by anyone, is unable to tie his shoes due to back pain, but is able to complete other components of dressing himself and caring for himself. [*Id.*] Plaintiff did not recall any mental health hospitalizations, but did recall having a laparotomy, a GI surgery for an incident in which he was stabbed in the abdomen. [*Id.*] On review of Plaintiff's systems, Dr. Bell noted back pain as well as numbness in Plaintiff's hands and swelling within his knees. [R. 292.] He also noted that Plaintiff complained of shortness of breath although he denied having asthma or COPD. [*Id.*] Dr. Bell noted that Plaintiff was cooperative during the exam but

indicated he was irritated by so many questions. [R. 293.] Plaintiff's musculoskeletal exam was painful throughout. [*Id.*] He experienced chest wall tenderness, tenderness in his back, tenderness over the abdomen and muscles in the lower extremities, and pain in the neck with limited range of motion in the neck. [*Id.*] Examination of Plaintiff's left shoulder was completely normal, but he complained of significant pain in the right shoulder. [*Id.*] There was no evidence of atrophy of the upper or lower extremities; no abnormalities of the elbow, wrist, knees, or hips; and Plaintiff got on and off the examining table by himself but complained of pain and seemed to struggle. [*Id.*]

On neurologic exam, Dr. Bell noted that Plaintiff complained of significant pain to sensation on the entire left side that included his face, shoulders, hands and lower extremities. [*Id.*] Examination of Plaintiff's hand grip for both the right and left hand was 2/5 even though there were no abnormalities of the joints in either hand. [*Id.*] Fine movement of both hands was normal; and his gait was normal. [*Id.*] Dr. Bell concluded that it was questionable whether or not Plaintiff is malingering because his neurological findings did not make a whole lot of sense. [R. 294.]

Treatment notes dated July 23, 2013, indicated Plaintiff was seen at Charleston Community Mental Health ("CCMH"). [R. 314.] Plaintiff reported that his meds were helpful and well tolerated; functioning at his usual level, sleep and appetite stable; neuropathic pain greatly helped by Neurontin; no new physical health concerns. [*Id.*] The plan was for Plaintiff to continue on current meds and return in three months. [*Id.*]

Treatment notes dated October 16, 2013, indicated Plaintiff was seen again at CCMH, after being assaulted in a convenience store that was being robbed, and his upper

teeth were knocked out; since then, his nightmares have gotten worse.  [R. 316.]  The plan included continuing him on his current medications and increasing his Prazosin dosage. [*Id.*]  Plaintiff was seen again by at CCMH on follow up on January 14, 2014, and reported doing well except for some mild insomnia, and meds were helpful and well tolerated.  [R. 318.] He reported functioning was better, appetite was good, no new physical health concerns. [*Id.*]

**Educational Records**

Educational records from the Charleston County School District ("CCSD") contain results of a psychological re-evaluation report dated March 19, 1986, which was performed by school psychologist Jean Forsythe to determine Plaintiff's continued placement in special education, as he was currently enrolled in a learning disabilities resource program. [R. 309.] Plaintiff's age was 16 years and 7 months.  [*Id.*]  The evaluation contained results from Plaintiff's previous IQ testing which showed as follows:

**Wechsler Intelligence Scale for Children-Revised (WISC-R)**

| Intelligence Quotient (IQ) | 11-29-82 | 10-22-79 | 12-13-76 |
|---|---|---|---|
| Verbal Score | 86 | 75 | 90 |
| Performance Score | 75 | 71 | 77 |
| Full Scale Score | 80 | 71 | 82 |

[*R.* 309.]

The results of the testing conducted in March 1986 resulted in the following findings:

29

**Wechsler Intelligence Scale for Children-Revised (WISC-R)**

|  | Scaled Score | Intelligence Quotient (IQ) |
|---|---|---|
| Verbal Score | 27 | 72 |
| Performance Score | 27 | 70 |
| Full Scale Score | 54 | 69 |

The school psychologist indicated that Plaintiff's performance on the WISC-R fell within the range of educably mentally handicapped. [R. 310.]

Plaintiff was referred to psychological services for re-evaluation as his testing represented a decrease in his abilities from the previous testing, and suggested that his placement be re-evaluated.   [R. 311.]   Plaintiff was noted to exhibit poor receptive vocabulary and adaptive behaviors and that his testing likely made him a candidate for placement in a program for educably mentally handicapped.  [*Id.*]

**The ALJ's Listing Analysis**

Plaintiff challenges the ALJ's consideration of Listing 12.05C as too cursory and overly broad.  [Doc. 14 at 6.]  Plaintiff argues that the evidence supports a finding that Plaintiff's mental retardation with deficits in adapted functioning manifested during his developmental period met the first requirement in Listing 12.05C.  [*Id*. at 6–7.] Plaintiff submits that there is substantial evidence in the record that Plaintiff's mental impairment met the requirements of Listing 12.05C.  [*Id*. at 7.]  The Court disagrees.

*Discussion*

To determine whether a claimant's impairments meet or equal a listed impairment, the ALJ identifies the relevant listed impairments and compares the listing criteria with the evidence of the claimant's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir.

1986) (stating that without identifying the relevant listings and comparing the claimant's symptoms to the listing criteria, "it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*, No. WMN–99–3696, 2000 WL 1916316, at *9 (D.Md. Dec. 15, 2000) ("In cases where there is 'ample factual support in the record' for a particular listing, the ALJ must provide a full analysis to determine whether the claimant's impairment meets or equals the listing." (*quoting Cook*, 783 F.2d at 1172)).

In this case, the ALJ identified Listing 12.05 as a relevant listing [R. 13–14], which the parties do not dispute.  Listing 12.05C reads as follows:

> *Mental retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ...
>
> C.     A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> ....

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.  As stated above, Plaintiff contends the ALJ should have found that he met the requirements of Listing 12.05C.

To meet Listing 12.05, a claimant must satisfy the "diagnostic description" in the introductory paragraph ***and*** any one of the four sets of criteria—A, B, C, or D.  *Id.* § 12.00A (emphasis added).  Thus, in order to meet Listing 12.05C, the claimant must establish he has an IQ between 60 and 70 and "a physical or other mental impairment imposing an

additional and significant work-related limitation of function." *Id*. § 12.05C.  The law provides that an ALJ may reject an IQ score if it is inconsistent with other substantial evidence in the record, such as conflicting professional opinions or other record evidence indicating that the claimant historically achieved higher scores or has more advanced functional capacities than would be expected from someone with a below-average IQ.  *See Markle v. Barnhart*, 324 F.3d 182, 186 (3d Cir. 2003); *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998).  The Fourth Circuit Court of Appeals also determined that an ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only IQ test result in the record.  *See Hancock v. Astrue*, 667 F.3d 470, 474–75 (4th Cir. 2012).  The Court notes the Commissioner has recognized that an individual's IQ tends to stabilize by age sixteen; that consistency among sub-test scores increases confidence in the test's accuracy; and that the practice of inferring low IQ during the developmental period from testing done later in life has been approved.  *Davis v. Asture*, C/A No. 2:07-1621-JFA-RSC, 2008 WL 1826493, at *4 (DSC April 23, 2008) (citing 65 Fed.Reg. 50,746, 50,772 (Aug. 20, 2000)).

In this case, the ALJ explained his consideration of Plaintiff's IQ score as follows:

> . . . I am aware that the claimant had a full-scale I.Q. score of 56 upon consultative psychological evaluation by Dr. Rieder in May 2009; however, the psychologist described the claimant's I.Q. results as an underestimate of the claimant's abilities due to his apparent sub-optimal effort.  He also noted that the claimant's I.Q. and achievement results represented a significant decline from 1986 Charleston County school education results and that such a marked decline is highly unusual especially decline in all categories including crystallized knowledge.  (B2F) Therefore, I concluded the claimant's May 2009 I.Q. results are invalid.

> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. I am aware that the claimant had a full-scale I.Q. score of 69 upon I.Q. testing by his school psychologist in March 1986; however, his earlier full-scale I.Q. scores (upon testing on three occasions during the period from October 1979 through November 1982) ranged from 71-82. (Exhibit B11F) Moreover, there is no evidence of any disorder to explain the claimant's decline with respect to his intellectual functioning. Therefore, I conclude that there is not clear evidence that the claimant has a valid I.Q. score of 60 through 70.

[R. 14.] The ALJ also noted that, while Dr. Sausser in 2013 estimated that Plaintiff's intellectual ability fell in the mentally retarded range based on responses to several questions, Dr. Sausser suggested Plaintiff was malingering and declined to diagnosis Plaintiff with mental retardation. [R. 17.] Additionally, the ALJ pointed out that Dr. Rieder voiced concerns after consultative evaluation in 2009 that Plaintiff was malingering. [*Id.*] Dr. Rieder expressly noted that Plaintiff's effort was sub-optimal and the results of this testing underestimated his abilities and were inconsistent with his presentation. [R. 260.]

While Plaintiff generally concludes that Plaintiff met Listing 12.05C, he failed to explain why the ALJ's evaluation of Plaintiff's IQ score was in error. As the ALJ noted, Plaintiff's IQ scores generally ranged from 71-82 during his school years with one score resulting in a 69 in March 1986 and one IQ score of 56 in 2009. Evidence of record shows, however, that at least one evaluator, Dr. Rieder in 2009, found the significant decline in Plaintiff's IQ in all categories, including crystalized knowledge, to be highly unusual. [R. 260.] Dr. Rieder likewise assessed Plaintiff's cognitive abilities and found his efforts to be

sub-optimal and the results as underestimating his abilities and inconsistent with his presentation. [*Id*.]

Upon review, the Court finds no error in the ALJ's finding that Plaintiff failed to meet the requisite elements of Listing 12.05C by failing to show an IQ score in the range of 60–70. The ALJ sufficiently explained why he rejected the two lower IQ scores. Not only did the record contain conflicting scores showing higher IQ ranges, but licensed professionals questioned the validity of the lower IQ scores Plaintiff achieved in later testing. And, because Plaintiff put forth no evidence to explain what could have caused his IQ score to drop in 1986, and again during the 2009 testing, particularly in light of the several allegations of malingering, the Court fails to find any error in the ALJ's analysis.

**Combined Effect of All of Plaintiff's Impairments**

Plaintiff challenges the ALJ's findings alleging he inadequately explained his evaluation of the combined effect of all of Plaintiff's impairments. [Doc. 14 at 8.] Specifically, Plaintiff takes issue with the ALJ's failure to identify Plaintiff's hip and shoulder impairments as either severe or non-severe impairments. [*Id*.] And, Plaintiff contends that, while the ALJ found his left arm numbness and headaches to be non-severe, he did not explain how these non-severe impairments affected, either individually or in combination with other impairments, Plaintiff's ability to function. [*Id*. at 9.] Plaintiff also suggests that the ALJ failed to consider how Plaintiff's education aggravated or increased the functional limitations caused by his intellectual deficit. [*Id*.] The Court disagrees.

### *Discussion*

"Congress explicitly requires that 'the combined effect of all the individual's impairments' be considered, 'without regard to whether such impairment if considered separately' would be sufficiently severe." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (quoting 42 U.S.C. § 423(d)(2)(c) and *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir.1989)). In the decades since the *Walker* decision, the Fourth Circuit has provided very little elaboration about the meaning of "adequate" explanation of evaluation of the combined effects of the impairments. In an unpublished opinion, the Court found that a district court had "correctly determined that the [Commissioner] had adequately explained his evaluation of the combined effect of [a claimant's] impairments." *Green v. Chater*, No. 94-2049, 1995 WL 478032, at *3 (4th Cir. 1995). Although the issue there regarded medical equivalence—a factor in determining whether impairments meet listing level severity—the opinion sheds light on the Fourth Circuit's threshold for analyzing the combined effect of a claimant's symptoms on his ability to engage in substantial gainful activity, suggesting *Walker* was not meant to be used as a trap for the Commissioner. The Court focused on the Commissioner's conclusions that he considered the combination of the claimant's impairments in determining disability and noted findings consistent with that conclusion. *Id*.

Accordingly, the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments. Most importantly, when multiple impairments are present, this Court must be satisfied that the Commissioner's decision regarding disability is not founded on a

35

fragmentized analysis of those impairments. *Walker*, 889 F.2d at 50. If the Commissioner's analysis is fragmentized, it is, of course, Plaintiff's task to adequately show the Court that the Commissioner's decision could have been different had he done an adequate combined effect analysis of his multiple impairments. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994).

Upon review of the ALJ's decision, the Court finds that the ALJ considered the combined effect of all of Plaintiff's impairments and that his consideration was supported by substantial evidence. Without restating the decision, the Court notes the ALJ addressed the symptoms of each of Plaintiff's impairments and adjusted the RFC accordingly. [*See* R. 14–18.] The Court notes that, contrary to Plaintiff's assertion, the ALJ specifically found that Plaintiff failed to seek medical treatment for his alleged left-side numbness and headaches and that the record failed to show that these impairments caused any work-related functional limitations. [R. 12.] With respect to Plaintiff's hip and shoulder, the ALJ noted that Plaintiff's gait was consistently noted as normal [R. 12, 16], and that there was no evidence of atrophy despite complaints of right shoulder pain [R. 18]. The ALJ specifically pointed out that Dr. Bell, who evaluated alleged left side numbness, suspected malingering. [*Id*.] Furthermore, with respect to Plaintiff's mental impairments, the ALJ expressly noted consideration of Plaintiff's mental impairments in combination in determining the RFC. [R. 18.] And while Plaintiff challenges the ALJ's consideration of his impairments, Plaintiff fails to point out any additional limitations that should have been included in the RFC.

A finding that the ALJ's analysis here was fragmentized would impose a standard too strict to remain within the scope of this Court's mission under § 405(g), which mandates

great deference to the Commissioner.  Indeed, "[t]o require a more elaborate articulation of the ALJ's thought processes would not be reasonable." *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  Upon review, the Court finds no error in the ALJ's conclusion that Plaintiff's "degenerative disc disease and subjective pain complaints could reasonably be expected to limit him to a range of light work activity and his combination of mental impairments could rationally be anticipated to restrict him to simple, routine tasks in a low stress work environment (described as involving only occasional changes in work setting and no involving production rate or fast-paced work) with only occasional interaction with the public and co-workers." [R. 18.]  A remand to the Commissioner for further discussion of the ALJ's consideration of the effect of all of Plaintiff's combined impairments on his ability to work would serve no purpose here.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that the Commissioner's decision be AFFIRMED.

**IT IS SO RECOMMENDED**.


s/Jacquelyn D. Austin
United States Magistrate Judge

January 5, 2017
Greenville, South Carolina